IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

IN RE:                          )
                                )
BONNIE H. HAYES,                )          CASE NO. 07-02564
                                )          CHAPTER 13
            Debtor.             )
                                )
STEVEN G. TUCKER,               )          CASE NO. 07-03798
                                )          CHAPTER 13
            Debtor.             )

_____

# MEMORANDUM
_____

The issue in these consolidated Chapter 13 cases is whether CitiFinancial and

GMAC hold purchase money security interests to which 11 U.S.C. § 506 "shall not apply"

under the hanging sentence at the end of 11 U.S.C. § 1325(a). Because the conditions in

the hanging sentence are collateral-specific and these creditors do not claim purchase

money security interests in some items of their collateral, the protection from bifurcation

in the hanging sentence is not available to portions of the debt in each case. In addition,

bundling the sale of credit disability insurance, "GAP" insurance and the payoff of "negative

equity" with the sale and financing of cars raises fact questions under state law with

respect to the extent these creditors hold purchase money security interests. GMAC and

CitiFinancial failed to prove the enabling nature or "close nexus" of some financed amounts

1

to the purchase of cars by the debtors. GMAC and CitiFinancial hold reduced purchase money secured claims for purposes of the hanging sentence. As proposed, the debtors' plans cannot be confirmed. The following constitute findings of fact and conclusions of law. FED. R. BANKR. P. 7054.

# I. FACTS

### *Hayes* Case

Bonnie Hayes filed Chapter 13 on April 13, 2007. Within the prior year, Hayes bought a 2006 Chevrolet Malibu from Bill Heard Chevrolet. The Retail Installment Sale Contract provided a "cash price" of $20,009.10. Additional charges were: 1) title, licensing and registration fees of $95; 2) dealership document and processing fees of $399; and, 3) GAP insurance[1] of $599. The Hayes Contract stated that the GAP insurance was purchased through First Colonial Insurance Company. The Contract recited that Hayes was "not required to buy" GAP insurance to obtain credit and that her decision to buy or not to buy GAP insurance "will not be a factor in the credit approval process."

Hayes made a cash down payment of $1,000.00. She received credit for a manufacturer's rebate of $2,500.

The Contract shows that Hayes traded in a 2004 Toyota 4 Runner. A trade in allowance of $21,500.00 was given for the Toyota. Hayes still owed Toyota Motor Credit $26,325.25 on the Toyota. The difference between the allowed value and the debt secured by the Toyota—sometimes called "negative equity"—was $4,825.25.[2] The total amount

---

[1]  In the event of casualty, GAP insurance pays the difference between what is owed on the vehicle and what the general insurer declares the vehicle to be worth.

[2]  CitiFinancial asserts that the "negative equity" in this case was only $1,325.25. This amount is

2

owed Toyota Motor Credit Corporation on the 4 Runner was listed as "Pay Off Made By Seller."

The total amount financed under the Hayes Contract was $22,427.35 with interest at 15.95%. As security for the financed amount, the Hayes Contract stated:

> **Security Interest.**
> You give us a security interest in:
> • The vehicle and all parts or goods installed in it;
> • All money or good received (proceeds) for the vehicle;
> • All insurance, maintenance, service or other contracts we finance for you; and
> • All proceeds from insurance, maintenance, service or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.
> This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

The Hayes Contract includes this provision for payment allocation: "We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contact in any order we choose." The Hayes Contract made federal law and Tennessee law applicable.

The Hayes Contract was assigned by Bill Heard Chevrolet to CitiFinancial Auto Corp. CitiFinancial filed a proof of claim in the Hayes Chapter 13 case for $22,080.27.

The Hayes Chapter 13 plan strips down CitiFinancial's secured claim to the value of the Malibu. The Hayes Plan gives Citifinancial a secured claim of $12,450, with interest

---

calculated by subtracting from $4,825.25 the $1,000 cash down payment by Hayes and the $2,500 rebate given on the purchase of the Malibu. CitiFinancial's calculation is not supported by the Contract. The cash and rebate are included under down payment on the new vehicle. The "pay off made by seller" is stated as $26,325.25 against an allowance on the trade-in of $21,500. The difference, the "negative equity," is $4,825.25.

3

at 8.25%. The balance of CitiFinancial's claim shares pro-rata with other unsecured creditors.

***Tucker* Case**

Steven and Melissa Tucker filed Chapter 13 on May 31, 2007. Within the prior year, Steven Tucker bought a 2006 GMC Sierra from Neill-Sandler Buick-Pont-GMC Truck, Inc. The Tucker Contract provided a "cash price (including any accessories, services, and taxes)" of $30,933.69. Additional charges were: 1) government certificate of title fees of $24.50; 2) dealership document fees of $75.00; 3) "Ownerguard" or GAP insurance of $595.00; and, 4) credit disability insurance of $1,489.89. The GAP insurance was purchased through Virginia Surety; the disability insurance through Life Investors. The Tucker Contract stated with respect to these insurance policies:

> Insurance: You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.
> * * *
> Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost.

Tucker made no cash down payment, but traded in an unencumbered 1997 Chevrolet Camaro for which he was given $1,500. After credit for a rebate of $6,750, the amount due for the Sierra was $22,683.69. The total amount financed under the Tucker Contract was $24,868.08 with interest at 11.49%.

As security for the financed amount, the Tucker Contract stated:

**Security Interest**. You give us a security interest in

4

1. The vehicle and all parts or goods installed in it,
2. All money or good received (proceeds) for the vehicle,
3. All insurance, maintenance, service or other contracts we finance for you, and
4. All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums.

This secured payment of all you owe on this contract It also secured your other agreements in this contract You will make sure the title shows our security interest (lien) in the vehicle.

The Tucker Contract included this provision on payment allocation: "We will apply each payment first to the earned and unpaid part of the Finance Charge, and then to the unpaid part of the Amount Financed." The Tucker Contract made federal and Tennessee law applicable.

The Tucker Contract was assigned by Neill-Sandler to General Motors Acceptance Corp. GMAC filed a proof of claim for $25,325.71.

The Tucker Chapter 13 plan strips down GMAC's secured claim to the value of the Sierra. The Tucker Plan gives GMAC a secured claim of $18,550.00, with interest at 8.25%. The balance of GMAC's claim is treated as unsecured to receive not less than 20% over the life of the plan.

## II. ARGUMENTS BY PARTIES

CitiFinancial objects to strip down of its secured claim.[3] In a refrain familiar throughout current Chapter 13 practice, Citifinancial asserts that it holds a qualifying purchase money security interest for the full amount of its debt as contemplated by the

---

[3] CitiFinancial also objects to the Hayes Plan based on lack of good faith and inadequacy of interest rate. The parties reserved those issues pending the outcome of this hanging sentence objection.

5

hanging sentence at the end of § 1325(a), precluding application of § 506 and insulating its claim from strip down in the Hayes Plan.

With respect to the extent of its purchase money security interest, CitiFinancial states the parties engaged in one transaction, in one document, involving the sale/purchase of one vehicle. The "negative equity" and GAP insurance were "incorporated into the 'value given to enable the debtor to acquire rights in the . . . collateral.'" As characterized by CitiFinancial, there was a "close nexus" between its purchase money security interest in the car and the money it advanced Hayes to purchase GAP insurance and to pay off Hayes' debt at Toyota Motor Credit. CitiFinancial asserts that absent financing of negative equity, Hayes would have been unable to purchase the Malibu.

CitiFinancial cites TENN. CODE ANN. § 47-14-120(b) to support including negative equity in the amount secured by the Malibu. This provision of Tennessee law identifies the amount paid to discharge a lien on a trade-in as a component of "time price" for purposes of charging interest. CitiFinancial also refers to Comment 3 of UCC § 9-103, adopted by Tennessee in connection with Revised Article 9.

GMAC objects to strip down of its secured claim.[4] GMAC asserts that it holds a qualifying purchase money security interest for the full amount of its debt as contemplated by the hanging sentence at the end of § 1325(a), precluding strip down in the Tucker Plan.

GMAC argues that use of the phrase purchase money security interest in the hanging sentence indicates Congressional intent to incorporate the UCC definition of

---

[4] GMAC also objects on grounds of lack of adequate protection under 11 U.S.C. § 1325(a)(1) and failure to be compensated for the time value of money under § 1325(a)(5)(B)(ii), but has reserved those objections.

6

purchase money security interest as well as state law interpretation of the concept. GMAC says advances for insurance premiums fall within both prongs of the state law definition of purchase money obligation: "price" and "value given to enable." Comment 3 to UCC § 9-103 explains that these words include "obligations for expenses incurred in connection with acquiring rights in the collateral," which GMAC contends includes GAP insurance and credit disability insurance. GMAC characterizes GAP and disability insurance as "expenses of collection and enforcement" identified by Comment 3 as elements of a purchase money obligation.

GMAC also claims support for full protection of its claim by reference to the Truth In Lending Act and Regulation Z (12 CFR Pt. 26). Regulation Z was amended in 1999 to require that fees, costs and charges for insurance and the like be included in disclosure of the amount financed.

The Standing Chapter 13 Trustee for this district, Henry E. Hildebrand, III, asserts that financing credit disability insurance, GAP insurance or negative equity in an automobile sale contract forfeits part or all of the purchase money security interests claimed by CitiFinancial and GMAC. The restriction on bifurcation of secured claims in the hanging sentence, presses the Trustee, "applies only to a claim based on a debt *entirely* secured by a purchase money security interest."

Alternatively, the Trustee offers that if a "dual status rule" allows CitiFinancial and/or GMAC to have partially protected purchase money security interests, then the creditors had the burden of proof to allocate debt and payments between purchase and nonpurchase money portions. The Trustee asserts that neither lender proved an allocation methodology that saves any purchase money portion of their claims.

7

# III. Discussion

**The Hanging Sentence**

Section 1325(a)(5) governs the treatment of allowed secured claims in Chapter 13 plans.[5] Prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA),[6] § 1325(a)(5) meshed with 11 U.S.C. §§ 506(a)[7] and

---

[5] 11 U.S.C. § 1325(a)(5) provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if–
* * *
    (5) with respect to each allowed secured claim provided for by the plan–
        (A) the holder of such claim has accepted the plan;
        (B)(i) the plan provides that–
            (I) the holder of such claim retain the lien securing such claim until the earlier of–
            (aa) the payment of the underlying debt determined under nonbankruptcy law; or
              (bb) discharge under section 1328; and
            (II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;
        (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and
        (iii) if–
            (I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and
            (II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or
        (C) the debtor surrenders the property securing such claim to such holder[.]

11 U.S.C. § 1325(a)(5).

[6] Pub. L. No. 109-8, 119 Stat. 23, 2005.

[7]     (a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such

8

1322(b)(2)[8] to enable Chapter 13 debtors to bifurcate undersecured claims into secured

and unsecured portions. Reflecting economic reality, a Chapter 13 plan could strip-down

the secured portion of an undersecured claim to the value of the collateral. Any amount

owed in excess of the value of the collateral became an unsecured claim that shared pro

rata with other unsecured creditors. *See, e.g.*, *Memphis Bank & Trust Co. v. Whitman,* 692

F.2d 427, 429 (6th Cir. 1982) ("The total claim of the secured creditor which is to be

allowed is divided into two parts, the secured portion of the claim and the unsecured

portion. These two are called in section 1325 the 'allowed secured claim' and the 'allowed

unsecured claim.' The secured portion of the total claim represents the present value of

the collateral and the unsecured portion is the remainder, i.e., the amount the allowed

claim exceeds the value of the collateral.").

In an enigmatic "hanging sentence" parked at the end of § 1325(a), BAPCPA

changed the treatment of certain allowed secured claims in Chapter 13 cases:

> For purposes of paragraph (5) [of § 1325(a)], section 506 shall not apply to
> a claim described in that paragraph if the creditor has a purchase money
> security interest securing the debt that is the subject of the claim, the debt
> was incurred within the 910-day [*sic*] preceding the date of the filing of the
> petition, and the collateral for that debt consists of a motor vehicle (as
> defined in section 30102 of title 49) acquired for the personal use of the
> debtor, or if collateral for that debt consists of any other thing of value, if the

---

disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a).

[8]    (b) Subject to subsections (a) and (c) of this section, the plan may—
* * * *
       (2) modify the rights of holders of secured claims, other than a claim secured
       only by a security interest in real property that is the debtor's principal residence,
       or of holders of unsecured claims, or leave unaffected the rights of holders of
       any class of claims[.]

11 U.S.C. § 1322(b)(2).

9

debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a)(hanging sentence).[9]

The parties do not dispute that the claims at issue in these cases are "allowed secured claims" within the meaning of § 1325(a)(5).[10] The parties do not dispute that bifurcation or claim stripping is not available when an allowed secured claim is protected by the hanging sentence.[11] There is no dispute that the collateral in both of these cases

---

[9] The reader immediately notices two problems. First, the provision "has no alphanumeric designation and merely dangles at the end of § 1325(a). There is no way to cite to this provision other than its proximity to other citable provisions." Dianne C. Kerns, *Cram-a-lot: The Quest Continues*, 24 Nov. Am. Bankr. Inst. J. 10, 10 (2005). In addition, the provision is "missing an operable word. The first sentence refers to 'the 910-day [period] preceding the date of the filing of the petition ...' " *Id*. Without the addition of "period," the provision makes little sense and could be read to apply only to debts of the type described that were incurred exactly 910 days-no more, no less-prior to the petition date.

*In re Carver,* 338 B.R. 521, 523 (Bankr. S.D. Ga. 2006) (observing also that "[t]hese two problems are mere shadows of the larger interpretation difficulties this provision presents.").

[10] Left for another day is the question whether a creditor can have an "allowed secured claim" when § 506 "shall not apply" because of the hanging sentence. *See In re Kinsey*, 368 B.R. 888, 892 (Bankr. D. Kan. 2007) ("Nowhere does the Code say a creditor may have an 'allowed secured claim' under § 1325(a)(5) without § 506(a)."); *In re White*, 352 B.R. 633, 644 (Bankr. E.D. La. 2006) ("The conundrum is in determining to what extent § 506 is to be ignored."); *In re Wampler,* 345 B.R. 730, 736 (Bankr. D. Kan. 2006) ("Because § 506 does not apply to creditors who claims fall under the umbrella of the 910 Language and the only means by which said creditors are entitled to an allowed secured claim is by determination under the provisions of § 506, those creditors cannot hold allowed secured claims and are not entitled to the same treatment found in § 1325(a)(5)."); *In re Taranto,* 344 B.R. 857, 862 (Bankr. N.D. Ohio 2006) ("For a claimant to have the benefits of § 1325(a)(5), it must hold an allowed secured claim. Under the Bankruptcy Code, one holds an allowed secured claim only through operation of § 506. The 910 Provision specifically excludes the application of § 506."), *rev'd,* 365 B.R. 85, 89–91 (B.A.P. 6th Cir. 2007); *In re Carver,* 338 B.R. 521, 524 (Bankr. S.D. Ga. 2006) ("Without application of § 506(a), a claim is merely an allowed claim; it cannot be a secured claim.").

[11] Many courts have reported decisions holding that an allowed secured claim to which "§ 506 shall not apply" can be modified at confirmation consistent with § 1322(b)(2) but must be treated as if it is fully secured, without regard to collateral value—most including postconfirmation interest at the rate described in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951, 158 L. Ed. 2d 787 (2004). *See Community Am. Credit Union v. Griffin (In re Gallagher),* Nos. KS-07-051, 06-22047, 2007 WL 2745808 (B.A.P. 10th Cir. Sept. 21, 2007); *Daimlerchrysler Fin. Servs. N. Am. LLC v. Griffin (In re Wilson),* 374 B.R. 251 (B.A.P. 10th Cir. 2007); *In re Quick,* 371 B.R. 459 (B.A.P. 10th Cir. 2007); *Trejos v. VW Credit Inc. (In re Trejos),* 374 B.R. 210 (B.A.P. 9th Cir. 2007); *Citifinancial Auto v. Smith,* No. 07-2190-JAR, 2007 WL 2092980 (D. Kan. July 18, 2007); *Ford Motor Credit Co. v. Hipsher,* No. 07-2207-JAR, 2007 WL 2099701 (D. Kan. July 18, 2007); *Sparks v. HSBC Auto Fin.,* No. 1:06cv670, 2007 WL 2080289 (S.D. Ohio July 18, 2007); *Horr v. Jake Sweeney Smartmart,*

includes a motor vehicle; that these debts were incurred less than 910-days prior to the bankruptcy cases; and, that the cars were acquired for personal use.

Construing the hanging sentence begins "where all such inquiries begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240, 109 S. Ct. 1026, 1030, 103 L. Ed. 2d 290 (1989) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S. Ct. 2297, 2301, 85 L. Ed. 2d 692 (1985)). "[W]here . . . the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *Id.* (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S. Ct. 192, 194, 61 L. Ed. 442 (1917)).

The hanging sentence first requires identification of what the collateral "consists of." The hanging sentence has different rules for two classes of collateral—"motor vehicle" or

---

*Inc.,* No. 1:07-CV-00010, 2007 WL 1989611 (S.D. Ohio July 6, 2007); *In re Morris,* 370 B.R. 796 (E.D. Wis. 2007); *Citifinancial Auto v. Hernandez-Simpson (In re Hernandez-Simpson),* 369 B.R. 36 (D. Kan. 2007); *In re Davis,* No. 07-50761 RFH, 2007 WL 2710459 (Bankr. M.D. Ga. Sept. 12, 2007); *In re Thomas,* No. 06-21363, 2007 WL 2462664 (Bankr. D. Kan. Aug. 27, 2007); *In re Williams,* No. 06-32921-KRH, 2007 WL 2122131 (Bankr. E.D. Va. July 19, 2007); *In re Hopkins,* 371 B.R. 324 (Bankr. N.D. Ill. 2007); *In re Marshall,* No. 06-81935, 2007 WL 1725196 (Bankr. C.D. Ill. June 11, 2007); *In re Lorenz,* 368 B.R. 476 (Bankr. E.D. Va. 2007); *In re Adaway,* 367 B.R. 571 (Bankr. E.D. Tex. 2007); *In re Phillips,* 362 B.R. 284 (Bankr. E.D. Va. 2007); *In re McCormick,* No. 06-23358-SVK, 2006 WL 3499226 (Bankr. E.D. Wis. Dec. 5, 2006); *In re Henry,* 353 B.R. 261 (Bankr. D. Or. 2006); *In re Grunau,* 355 B.R. 334 (Bankr. M.D. Fla. 2006); *In re White,* 352 B.R. 633 (Bankr. E.D. La. 2006); *In re Brill,* 350 B.R. 853 (Bankr. E.D. Wis. 2006); *In re Turner,* 349 B.R. 437 (Bankr. D.S.C. 2006); *In re Ross,* 355 B.R. 53 (Bankr. W.D. Tenn. 2006); *In re Sparks,* 346 B.R. 767 (Bankr. S.D. Ohio 2006); *In re Brown,* 346 B.R. 246 (Bankr. M.D. Ga. 2006); *In re Murray,* 346 B.R. 237 (Bankr. M.D. Ga. 2006); *In re Soards,* 344 B.R. 829 (Bankr. W.D. Ky. 2006); *In re Brooks,* 344 B.R. 417 (Bankr. E.D.N.C. 2006); *In re Bufford,* 343 B.R. 827 (Bankr. N.D. Tex. 2006); *In re Parish,* No. 05-BK-15702-JAF, 2006 WL 1679710 (Bankr. M.D. Fla. May 12, 2006); *In re Staten,* No. 05-84077, 2006 WL 4458705 (Bankr. M.D.N.C. May 11, 2006); *In re Scruggs,* 342 B.R. 571 (Bankr. E.D. Ark. 2006); *In re Shaw,* 341 B.R. 543 (Bankr. M.D.N.C. 2006); *In re DeSardi,* 340 B.R. 790 (Bankr. S.D. Tex. 2006); *In re Brown,* 339 B.R. 818 (Bankr. S.D. Ga. 2006); *In re Fleming,* 339 B.R. 716 (Bankr. E.D. Mo. 2006); *In re Wright,* 338 B.R. 917 (Bankr. M.D. Ala. 2006); *In re Robinson,* 338 B.R. 70, 73–75 (Bankr. W.D. Mo. 2006). *But see In re Taranto,* 344 B.R. 857 (Bankr. N.D. Ohio 2006), *rev'd,* 365 B.R. 85, 89–91 (B.A.P. 6th Cir. 2007); *In re Kinsey,* 368 B.R. 888 (Bankr. D. Kan. 2007); *In re Robinson,* 355 B.R. 920 (Bankr. M.D. Ga. 2006); *In re Wampler,* 345 B.R. 730 (Bankr. D. Kan. 2006); *In re Carver,* 338 B.R. 521 (Bankr. S.D. Ga. 2006). *See also* 8 Alan N. Resnick & Henry J. Summer, Collier on Bankruptcy ¶ 1325.06[1][a] (15th ed. rev. 2007).

"any other thing of value." If the collateral consists of a motor vehicle,[12] protection from bifurcation under the hanging sentence requires proof of three elements: (1) the creditor has a purchase money security interest; (2) the debt was incurred within 910 days preceding the petition; and (3) the motor vehicle was acquired for the personal use of the debtor. If the collateral is "any other thing of value" then the creditor must prove that it has a purchase money security interest and that the debt was incurred within one year preceding the petition.

The collateral-specific distinction in the hanging sentence is evidence of Congressional intent to treat motor vehicle collateral differently than any other collateral.[13] The collateral-specific rules in the hanging sentence can only be respected by separate analysis of each item of collateral.

As quoted above, in the Hayes Contract, CitiFinancial was granted a security interest in the Malibu, in the GAP insurance contract financed by CitiFinancial, in all proceeds of GAP insurance and in any refunds of premiums of GAP insurance. Similarly, the Tucker Contract provided GMAC with a security interest in the Sierra, in both the GAP insurance and the credit disability insurance policies financed by GMAC, and in all proceeds or refunds of premiums from those insurance policies.

Hayes borrowed $599 from CitiFinancial that purchased a policy of GAP insurance from First Colonial Insurance Company. Tucker borrowed $595 from GMAC that purchased a policy of GAP insurance from Virginia Surety. Tucker also borrowed $1,489.89 from

---

[12]  *See* 49 U.S.C. § 30101.

[13]  The legislative history of the hanging sentence is explored in an Addendum to this Memorandum and is discussed further below.

GMAC that purchased a policy of credit disability insurance from Life Investors. The Tucker and Hayes Contracts unambiguously state that the collateral for these debts "consists of" both a motor vehicle and the insurance policies, proceeds and premium rebates.

Neither CitiFinancial nor GMAC contests that these insurance policies—together with proceeds and premium rebates—are "thing[s] of value." Neither CitiFinancial nor GMAC claim to have a purchase money security interest in the insurance policies, proceeds or premium rebates identified as collateral in their contracts. In fact, when pressed at oral argument, counsel for CitiFinancial and GMAC asserted they did not consider the insurance policies to be collateral—in obvious appreciation of the dilemma created by their contracts in this hanging sentence context. Neither CitiFinancial nor GMAC submitted authority to support a purchase money security interest in the insurance policies.[14] CitiFinancial and GMAC each have debts the collateral for which consists of one or more things of value with respect to which they do not have a purchase money security interest for purposes of the hanging sentence.

CitiFinancial and GMAC would end-run this failure of condition with respect to the hanging sentence and the debt secured by insurance policies with this clever syllogism: CitiFinancial and GMAC each claim a purchase money security interest in a car; under state law, the purchase money security interests in the cars extend to the *purchase money obligations* incurred by Hayes and Tucker to buy insurance policies; therefore, the hanging

[14] TENN. CODE ANN. § 47-9-109(d)(8) provides that UCC Revised Article 9, as codified in Tennessee, "does not apply to . . . a transfer of an interest in or an assignment of a claim under a policy of insurance, other than an assignment by or to a health-care provider of a health-care-insurance receivable and any subsequent assignment of the right to payment, but §§ 47-9-315 and 47-9-322 apply with respect to proceeds and priorities in proceeds[.]"

13

sentence prevents bifurcation of the entire debt based on the purchase money security interests in the cars—notwithstanding that neither CitiFinancial nor GMAC claims a purchase money security interest in the insurance policies, proceeds or premium rebates.

As discussed below, Article 9 of the Revised UCC does not respect different kinds of collateral the way the hanging sentence at the end of § 1325(a) of the Bankruptcy Code does. Perhaps, it would be nice if the hanging sentence made the same distinction between purchase money collateral and purchase money obligation that appears in the provisions of Article 9 cited by CitiFinancial and GMAC. Congress made a different policy decision to treat motor vehicle collateral differently than any other thing of value. The conditions in the hanging sentence are dependent on what the collateral consists of. Unhinging the purchase money security interest analysis from the collateral as argued by CitiFinancial and GMAC defeats the collateral-based distinction in the hanging sentence.

Imagine, a transaction more than one year before the petition in which a debtor buys a pickup truck and a horse trailer in a single transaction, using a single contract that granted a security interest in both. It is quite possible, according to CitiFinancial and GMAC, that state law would allow a purchase money security interest in the pickup to extend to the *purchase money obligation* incurred to pay for the horse trailer. It is beyond dispute that a horse trailer is not a motor vehicle. The hanging sentence would require separate analysis of the collateral that consists of the horse trailer. State commercial law with respect to purchase money security interests cannot trump the collateral-based distinction in the hanging sentence.

The incorporation of state law concepts into bankruptcy is not always pretty. There is a collision here between a strangely crafted but narrowly targeted special protection for

14

car lenders and a cross-reference to a commercial law concept under state law that serves different imperatives. CitiFinancial and GMAC would use state law to read out of the hanging sentence its collateral specific conditions. CitiFinancial and GMAC took insurance policies as collateral but did not prove purchase money security interests in that collateral. To the extent their debts are secured by things of value in which they do not have purchase money security interests, that debt is not protected from § 506 by the hanging sentence.

There is an irony here that is not unfamiliar to bankruptcy practitioners. A lender with less collateral could be better off under the hanging sentence. This is neither strange nor disruptive of the logic of the hanging sentence.

For example, since 1979, the Bankruptcy Code has elsewhere provided that a security interest in real property that is the debtor's principal residence is protected from modification by § 1322(b)(2).[15] Mortgage lenders that take security interests in other collateral—such as insurance policies, escrow accounts, rents, rental property and appliances—have been tested by Chapter 13 plans and have sometimes forfeited the protection from modification in § 1322(b)(2) because they took additional security interests and had collateral at the petition that was not real property.[16]

---

[15] 11 U.S.C. § 1322(b)(2) provides:

(b) Subject to subsections (a) and (c) of this section, the plan may—
* * * *
(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

[16] *See, e.g., Lomas Mortgage, Inc. v. Louis,* 82 F.3d 1 (1st Cir. 1996) (Mortgage secured by three unit multi-family property only one unit of which was the debtor's principal residence is not protected from modification by § 1322(b)(2).); *Hammond v. Commonwealth Mortgage of Am. (In re Hammond),* 27 F.3d 52 (3d Cir. 1994) (Additional security interest in escrow deposits for taxes and insurance premiums may forfeit the protection from modification in § 1322(b)(2).); *Allied Credit Corp. v. Davis (In re Davis),* 989 F.2d 208 (6th

15

A car lender whose collateral consists of things of value in addition to a motor vehicle is in much the same position with respect to the hanging sentence. The lender bargained for that extra collateral. The extra collateral clearly had economic value to the lender at the time of the transaction and the lender cannot escape the hand it dealt itself for purposes of the hanging sentence: some of its debt may be protected from § 506; some may not be protected.

CitiFinancial and GMAC would now disclaim some of the security interests contained in their contracts. Mortgage lenders in the § 1322(b)(2) context have tried the same maneuver—releasing, waiving or denying that they ever had a security interest in any thing other than the debtor's principal residence notwithstanding contrary language in their contracts. This effort to change the facts after the fact has been rejected by the courts in the § 1322(b)(2) context and is similarly rejected here.[17]

---

Cir. 1993) (Reserving issue whether additional security interest in insurance premiums or other types of insurance might serve as "additional security" for purposes of § 1322(b)(2).); *Sapos v. Provident Institute of Sav.,* 967 F.2d 918 (3d Cir. 1992) (Mortgage that includes security interest in rents may forfeit the protection from modification in § 1322(b)(2).); *Wilson v. Commonwealth Mortgage Corp.,* 895 F.2d 123 (3d Cir. 1990) (Security interest in "appliances, machinery, furniture and equipment" was an interest in personal property that forfeited the protection from modification in § 1322(b)(2).); *United Cos. Fin. Corp. v. Davis,* 148 B.R. 16 (W.D. La. 1992) (Applying *RTC v. Washington (In re Washington),* 967 F.2d 173 (5th Cir. 1992), credit life and disability insurance policies may be additional security that would forfeit the protection from modification in § 1322(b)(2).); *Transouth Fin. Corp. v. Hill,* 106 B.R. 145 (W.D. Tenn. 1989) (Second mortgage on debtor's residence also secured by credit life, credit disability including unearned or returned premiums is not protected from modification by § 1322(b)(2).).

[17] *See, e.g., In re Graham,* 144 B.R. 80 (Bankr. N.D. Ind. 1992) (Postpetition events cannot change the determination whether a creditor has a lien on property other than a debtor's principal residence for purposes of § 1322(b)(2). That the debtor avoids a creditor's lien on property other than the principal residence does not change the determination that the creditor had a security interest at the petition that was not protected by § 1322(b)(2).); *In re Dinsmore,* 141 B.R. 499 (Bankr. W.D. Mich. 1992) (Crucial date for § 1322(b)(2) purposes is the date of the petition; relief from stay after the petition cannot cleanse a creditor's security position of commercial assets that forfeit the protection from modification in § 1322(b)(2).); *In re Groff,* 131 B.R. 703 (Bankr. E.D. Wis. 1991) (Protection from modification in § 1322(b)(2) cannot be created by waiver after the petition of a security interest in property that is not the debtors' principal residence and that protection cannot be created by the debtor when the plan selectively abandons collateral after the petition; protection from modification in § 1322(b)(2) is determined based on collateral at the date of the petition.); *Dent v. Associates Equity Servs. Co. (In re Dent),* 130 B.R. 623 (Bankr. S.D. Ga. 1991) (Mortgage holder with

16

**Purchase Money Security Interests under Tennessee Law**

There is an alternative reason why the purchase money security interests CitiFinancial and GMAC claim in cars do not extend to the debt incurred by these debtors to purchase insurance policies: these creditors failed to prove the facts necessary to sustain this argument. This alternative outcome involves application of state law. An exploration of purchase money security interests under Tennessee law is necessary both to explain the alternative holding with respect to the insurance policies and to explain why CitiFinancial does not have a purchase money security interest that extends to the payoff of "negative equity" in the Hayes case.

While there is temptation to look for a federal definition of "purchase money security interest,"[18] prominent use of a term of art so closely identified with the Uniform Commercial Code and established state law counsels reference to state law. "Property interests are created and defined by state law. Unless some federal interest requires a different

_____

perfected security interest in escrow payments for taxes and insurance cannot restore the protection from modification in a § 1322(b)(2) by canceling the additional security interest and releasing the escrow payments after the petition.); *In re Green,* 7 B.R. 8 (Bankr. S.D. Ohio 1980) (Creditor holding a security interest in personal property and the debtors' principal residence is not entitled to protection from modification in § 1322(b)(2) when the creditor waived the security interest in personal property after the petition.).

[18] A federal definition of purchase money security interest for purposes of bankruptcy in general and the hanging sentence in particular, has been suggested. *See, e.g.*, Juliet M. Moringiello, *A Tale of Two Codes: Examining § 522(f) of the Bankruptcy Code, § 9-103 of the Uniform Commercial Code and the Proper Role of State Law in Bankruptcy*, 79 WASH. U. L.Q. 83 (2001) (noting that in "a consumer good transaction, purchase-money status is irrelevant outside of bankruptcy. A federal solution to the problem is appropriate and within Congress' constitutional authority to establish 'uniform Laws on the subject of Bankruptcies throughout the United States.'"). *See also In re Westfall*, 365 B.R. 755, 759 n.4 (Bankr. N.D. Ohio 2007) (for purposes of the hanging sentence a federal definition of purchase money security interest would raise certainty and the logical working of the Bankruptcy Code as a whole). Judge Kendig took a closer look at a federal definition of "purchase money security interest" in *In re Westfall*, No. 06-60297, 2007 WL 2777709 (Bankr. N.D. Ohio Sept. 24, 2007), and concluded for hanging sentence purposes, a federal dual status purchase money rule should be applied.

result[19] . . . . The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests[.]" *Butner v. United States*, 330 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (1979) (footnote omitted).

Here, both transactions occurred in Tennessee and each Contract includes a Tennessee choice of law provision. Tennessee adopted Revised Article 9 of the Uniform Commercial Code, effective in 2001. 2000 Tenn. Laws Pub. ch. 846, S.B. No. 2257, § 1 (May 30, 2000). The relevant provision is TENN. CODE ANN. § 47-9-301:

> (a) DEFINITIONS. In this section:
>
> (1) "purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and
>
> (2) "purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.
>
> (b) PURCHASE-MONEY SECURITY INTEREST IN GOODS. A security interest in goods is a purchase-money security interest:
>
> (1) to the extent that the goods are purchase-money collateral with respect to that security interest;
>
> (2) if the security interest is in inventory that is or was purchase-money collateral, also to the extent that the security interest secures a purchase-money obligation incurred with respect to other inventory in which the secured party holds or held a purchase-money security interest; and
>
> (3) also to the extent that the security interest secures a purchase-money obligation incurred with respect to software in which the secured party holds or held a purchase-money security interest.
> * * *

---

19 As explained immediately above, there is just such a "federal interest" in the hanging sentence with respect to separate identification and analysis of the insurance policies as items of collateral. As explained below, different interests may be at play with respect to the "negative equity" financing in the Hayes Contract.

18

(e) APPLICATION OF PAYMENTS.

(1) In a transaction other than a consumer-goods transaction, if the extent to which a security interest is a purchase-money security interest depends on the application of a payment to a particular obligation, the payment must be applied:

(A) in accordance with any reasonable method of application to which the parties agree;
(B) in the absence of the parties' agreement to a reasonable method, in accordance with any intention of the obligor manifested at or before the time of payment; or
(C) in the absence of an agreement to a reasonable method and a timely manifestation of the obligor's intention, in the following order:
(i) to obligations that are not secured; and
(ii) if more than one (1) obligation is secured, to obligations secured by purchase-money security interests in the order in which those obligations were incurred.

(2) In a consumer-goods transaction, if the extent to which a security interest is a purchase-money security interest depends on the application of a payment to a particular obligation:

(A) the payment must be applied so that the secured party retains no purchase money security interest in any property as to which the secured party has recovered payments aggregating the amount of the sale price including any finance charges attributable thereto; and

(B) for the purposes of this subsection only, in the case of items purchased on different dates, the first item purchased shall be deemed the first paid for, and in the case of items purchased on the same date, the lowest priced item shall be deemed first paid for.

(f) NO LOSS OF STATUS OF PURCHASE-MONEY SECURITY INTEREST IN NON-CONSUMER-GOODS TRANSACTION. In a transaction other than a consumer-goods transaction, a purchase-money security interest does not lose its status as such, even if:

(1) the purchase-money collateral also secures an obligation that is not a purchase-money obligation;

(2) collateral that is not purchase-money collateral also secures the purchase-money obligation; or

19

(3) the purchase-money obligation has been renewed, refinanced, consolidated, or restructured.

(g) BURDEN OF PROOF IN NON-CONSUMER-GOODS TRANSACTION. In a transaction other than a consumer-goods transaction, a secured party claiming a purchase-money security interest has the burden of establishing the extent to which the security interest is a purchase-money security interest.

(h) NON-CONSUMER GOODS TRANSACTIONS; NO INFERENCE. The limitation of the rules in subsections (e)(1), (f) and (g) to transactions other than consumer-goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

TENN. CODE ANN. § 47-9-103. This provision is identical to UCC § 9-103 but for the addition of subsection (e)(2), discussed below.

In addition to enacting most of UCC Revised Article 9, the Tennessee legislature copied the Reporter's Comments to the UCC revisions. "While not controlling authority, the Official Comments to the UCC provide guidance in construing statutory language and offer assistance in discerning the intent of the legislature in adopting the statutory scheme." *Wakefield v. Crawley*, 6 S.W.3d 442, 447 (Tenn. 1999). The Official Comment to UCC § 9-103 provides:

3. **"Purchase-Money Collateral"; "Purchase-Money Obligation"; "Purchase-Money Security Interest."** Subsection (a) defines "purchase-money collateral" and "purchase-money obligation." These terms are essential to the description of what constitutes a purchase-money security interest under subsection (b). As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

20

The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

U.C.C. § 9-103 cmt. 3.

GMAC and CitiFinancial argue that financing the purchase of insurance and the pay-off of negative equity (only an issue for CitiFinancial) 1) enabled the debtors to acquire rights in the new cars, 2) were "obligations for expenses incurred in connection with acquiring rights" in the cars, or 3) were in close nexus with the acquisition of the cars.

The concepts at work here under UCC § 9-103—"enabling," "incurred in connection with" and "close nexus"—are fact intensive. It is not every dollar loaned that becomes a *purchase money obligation* by relationship in time or circumstances to the financing of *purchase money collateral*. Close nexus or what enables a debtor to acquire rights in property require factual analysis in each case. *See General Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252, 256 (W.D.N.Y 2007) ("The fact that negative equity and trade-ins do not have to be included in a sale, and that the buyer could, in theory at least, pay off the negative equity by other means, does not require a contrary result, if the facts surrounding the particular transaction at issue are such that the negative equity was integral to the sale."); *In re Vega*, 344 B.R. 616, 622-23 (Bankr. D. Kan. 2006) ("[T]o have a PMSI, an otherwise secured party has the burden of proof to satisfy two key elements: 1) that the money loaned or credit extended made it possible for the debtor to obtain the collateral,

21

and 2) that debtor used the funds supplied to acquire rights in the collateral. . . . [Creditor] has not, and cannot . . . meet its burden.").[20]

This factual analysis begins but does not end with the parties' contracts. It is some evidence relative to the purchase money inquiry that multiple transactions are papered into one document. That these debtors simultaneously bought cars, bought insurance and in the Hayes case borrowed money to payoff a prior car loan is only weakly revealing whether the insurance purchases or payoff of debt enabled the debtors to acquire rights in the cars. Some courts have given too much weight to the presence of a single contract that includes multiple transactions.[21]

Particularly with respect to the purchase of insurance policies,[22] a closer look in Hayes and Tucker reveals that the contracts themselves belie the argument that the

---

[20] *See also Agricultural Management Dev., Inc. v. National City Bank,* No. 1:02-CV-11, 2003 WL 21919184, *18 (N.D. Ind. June 23, 2003) (creditor failed to prove a purchase money security interest as it could not identify which livestock its advances enabled debtor to purchase); *Key Bank Nat'l Ass'n v. Huntington Nat'l Bank,* No. 20725, 2002 WL 701941, *9 (Ohio App. Apr. 24, 2002) (Citing Ohio UCC, creditor must "introduc[e] . . . extrinsic evidence to prove a PMSI. Regardless of the terms of the security agreement, a secured party claiming a PMSI must demonstrate that it gave value to the debtor to enable it to acquire rights in or the use of the collateral and that the value was so used.").

[21] *See, e.g., GMAC v. Peaslee,* 373 B.R. at 259 ("Where the parties to the transaction agree to a 'package transaction' in which '[t]he negative equity is inextricably intertwined with the sales transaction and the financing of the purchase,' one could certainly conclude that '[t]his close nexus between the negative equity and this package transaction supports the conclusion that the negative equity must be considered as part of the price of the collateral.'" (quoting *Graupner v. Nuvell Credit Corp.,* No. 4:07-CV-37, 2007 WL 1858291, at *2 (M.D. Ga. June 26, 2007)).

[22] Most of the reported decisions addressing the issue have concluded that advances to purchase GAP insurance, credit life or credit disability insurance are not included in a purchase money security interest in a car notwithstanding that the purchase of the car and the purchase of insurance appear in a single contract. *See, e.g., In re Pajot,* 371 B.R. 139 (Bankr. E.D. Va. 2007) (GAP insurance is not included in purchase money security interest in car.); *In re Price,* 363 B.R. 734, 741 (Bankr. E.D.N.C. 2007) (Car lender does not have purchase money security interest to extent GAP insurance was included in purchase price. "Gap insurance . . . is neither mandatory, a component of the loan agreement, nor a value-enhancing add-on . . . . [G]ap insurance is not part of the purchase money security price of the collateral."); *In re White,* 352 B.R. 633 (Bankr. E.D. La. 2006) (Purchase money security interest does not include deficiency insurance.). *Compare In re Murray,* 352 B.R. 340 (Bankr. M.D. Ga. 2006) (Extended service contract or warranty are "inextricably related to the collateral" and included in the purchase money security interest for the car.).

insurance policies "enable[d]" the debtors to obtain rights in the cars. The Tucker Contract states that the debtor purchased a car from Neill-Sandler Buick-Pontiac-GMAC Truck, Inc., but separately purchased GAP insurance from another company named Virginia Surety and purchased credit disability insurance from yet a third company, Life Investors Insurance Company. With respect to both of these insurance policies, the Tucker Contract states explicitly: "You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process."

Similarly, the Hayes Contract shows the purchase of the Malibu from Bill Heard Chevrolet in Nashville, Tennessee and the purchase of GAP insurance from First Colonial Insurance Company in Jacksonville, Florida. With respect to the GAP insurance, the contract recites that Hayes was "not required to buy any other insurance to obtain credit . . . . Your decision to buy or not to buy other insurance will not be a factor in the credit approval process."

These provisions are evidence that neither GAP insurance nor credit disability insurance was even a consideration in the decision whether to loan money to these debtors to purchase cars. The nexus between the loan of money to buy cars and the loan of money to buy insurance is broken by the language of these contracts. If there was other evidence available of a connection between the sale of insurance to these debtors and loans to buy cars, it was not offered by either CitiFinancial or GMAC.

GMAC next argues that the money advanced to buy insurance was value given by GMAC that enabled Tucker to buy the Sierra as an "expense of collection and enforcement" within the meaning of Comment 3 to UCC § 9-103. The twisted logic here

23

seems to be that because GAP insurance would provide GMAC a shortcut to collection of its debt in the event of loss of the Sierra, the purchase of GAP insurance enabled Tucker to buy the Sierra.

GAP insurance shifts a risk from the insured to an insurance company that is paid a premium to accept that risk. There is no evidence that the incidental benefit to GMAC of that shifting of risk enabled Tucker to buy a car.

The contrasting treatment of physical damage insurance by the Hayes and Tucker Contracts is revealing. Both contracts mandated that physical damage insurance be purchased by the debtors in a form acceptable to the lenders or purchased from the vendors—"single interest insurance." In other words, each contract explicitly conditioned the loan to buy a car on provision of physical damage insurance—in contrast to the disclaimers with respect to GAP insurance and credit disability insurance.

In addition to the loan for GAP insurance, the Hayes Contract included an advance to payoff the loan from Toyota Motor Credit secured by the vehicle Hayes traded in. This advance was more than the value of the traded in vehicle, resulting in "negative equity."

There are some states that have amended their Commercial Codes or Motor Vehicle Registration statutes to specifically provide that the payoff of prior car debt is part of a subsequent purchase money obligation secured by different purchase money collateral.[23] A majority of reported decisions conclude that a loan to payoff "negative equity"

---

[23] *See, e.g., GMAC v. Peaslee,* 373 B.R. 252 (W.D.N.Y. 2007) (Applying § 9-103 of New York Uniform Commercial Code and New York Motor Vehicle Retail Installment Sales Act, negative equity is component of price of car and financing negative equity does not forfeit purchase money security interest.); *In re Petrocci,* 370 B.R. 489 (Bankr. N.D.N.Y. 2007) (Relying in part on New York Motor Vehicle Retail Installment Sales Act, financing of negative equity did not forfeit purchase money security interest status.); *In re Graupner,* 356 B.R. 907 (Bankr. M.D. Ga. 2006) (Reading Georgia's Motor Vehicle Sales Finance Act together with Georgia UCC, "cash sale price" under MVSFA includes amount to payoff trade-in, including

is not included in a purchase money security interest in a new car for purposes of the hanging sentence.[24]

By its nature, negative equity is unsecured debt. The payoff of negative equity as part of a new car purchase means the debtor converted unsecured debt into debt nominally secured by a new item of collateral. This is not exactly the example given in Comment 3 to UCC § 9-103, quoted above, but it raises the same issue: some loans to payoff pre-existing debt are not considered "purchase money obligations" by UCC § 9-103. Whether a loan to payoff pre-existing debt enables the debtor or has a close nexus to the acquisition of new purchase money collateral turns on the facts of individual transactions.

CitiFinancial had the burden to prove the close nexus between or the enabling nature of the financing of negative equity to the purchase of the Malibu. While CitiFinancial called Ms. Hayes as a witness, her testimony supported no such relationship.

The money advanced to pay off negative equity in the Hayes case went to Toyota Motor Credit and was not actually used to pay for the Malibu. In UCC parlance, the Toyota payoff portion of the loan may be secured by the purchase money collateral (the Malibu),

_____

negative equity.), *aff'd,* No. 4:07-CV-37CDL, 2007 WL 1858291 (M.D. Ga. June 26, 2007).

[24] *See In re Westfall,* No. 06-60297, 2007 WL 2777709 (Bankr. N.D. Ohio Sept. 24, 2007) (Negative equity financed as part of car purchase is not a purchase money obligation.); *In re Cohrs,* 373 B.R. 107 (Bankr. E.D. Cal. 2007) (Payoff of prior car is part of a purchase money transaction when debtor actually traded-in existing vehicle; different outcome likely when facts show that debtor did not trade-in existing vehicle.); *In re Pajot,* 371 B.R. 139 (Bankr. E.D. Va. 2007) (Portion of transaction corresponding to negative equity is not considered a purchase money security interest under Virginia law.); *In re Acaya,* 369 B.R. 564 (Bankr. N.D. Cal. 2007) (Amount used to pay negative equity does not constitute part of the price of the collateral or value given to acquire rights in the collateral.); *Citifinancial Auto v. Hernandez-Simpson (In re Hernandez-Simpson),* 369 B.R. 36 (D. Kan. 2007) (Negative equity financed as part of car purchase is not included in resulting PMSI.); *In re Price,* 363 B.R. 734 (Bankr. E.D.N.C. 2007) (Applying North Carolina law, funds advanced to pay off negative equity on trade-in are not part of purchase money security interest.); *In re Grant,* 359 B.R. 438 (Bankr. W.D.N.Y. 2007) (Trustee carried burden of proof that money to refinance negative equity was not part of purchase money security interest.); *In re Jackson,* 358 B.R. 560 (Bankr. W.D.N.Y. 2007) (Refinancing of negative equity not included in purchase money security interest.); *In re Vega,* 344 B.R. 616 (Bankr. D. Kan. 2006) (Loan proceeds used to pay off prior loan are not purchase money.).

Case 3:07-bk-02564    Doc 51    Filed 11/01/07    Entered 11/01/07 16:24:32    Desc Main
Document    Page 25 of 42

but it is not a purchase money obligation with respect to the new car. In the gray area created by the "close nexus" formulation, if there was evidence available to show that Hayes was enabled to acquire the new car by money loaned to payoff pre-existing unsecured debt, it was not presented by CitiFinancial.[25]

**Dual Status or Transformation under Tennessee Law**

Under the collateral-specific requirements of the hanging sentence and after application of state law, CitiFinancial and GMAC have debts that are partially within the conditions in the hanging sentence and partially not. This raises additional questions: what does the hanging sentence do with a debt that is only partially protected and does state law have anything to say about that question?

As noted above, Revised Article 9 of the Uniform Commercial Code in Tennessee has a modification relevant here. Like the UCC model law, the Tennessee statute does not expressly adopt a "transformation" rule or a "dual status" rule in consumer goods transactions. *See* TENN. CODE ANN. § 47-9-103(f). However, Tennessee's version, unlike the UCC and enactments in other states, includes this provision:

---

[25] GMAC and CitiFinancial cite other statutes in support of their positions. GMAC looks to the requirement in the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601-1667f, as implemented by Regulation Z (12 CFR Pt. 226), that funds advanced for insurance in a retail installment contract are included in the disclosure of total sales price. *See* 12 C.F.R. Pt. 226, Supp. I, at ¶ 18. *In re Pajot*, 371 B.R. 139, 150 (Bankr. E.D. Va. 2007), explained that TILA is a disclosure statute that does not presume to address the nature or extent of security interests under state or other federal law: TILA offers a "convenient and clear disclosure mechanism by which consumers are able to see and trace the negative equity [and other add-ons] rolled into their financing transaction. . . . TILA does not serve to define the relative priorities of creditors, and should not alter the substantive rights of the parties transacting under state secured transactions law." *Pajot*, 371 B.R. at 151.

CitiFinancial cites TENN. CODE ANN. § 47-14-120(b), which provides: "It shall be permitted to include in a motor vehicle retail installment contract containing the time price differential any amounts actually paid, or to be paid, by a seller pursuant to an agreement with a buyer to discharge a security interest, lien or lease interest on property traded in by a buyer." This provision is included in Chapter 14's provisions on interest rates and regulations on usury. That interest may be charged on the financing of the payoff of a trade-in does not answer the question whether financing negative equity is a purchase money obligation.

26

(e) APPLICATION OF PAYMENTS.
    * * * *
2) In a consumer-goods transaction, if the extent to which a security interest is a purchase-money security interest depends on the application of a payment to a particular obligation:

> (A) the payment must be applied so that the secured party retains no purchase money security interest in any property as to which the secured party has recovered payments aggregating the amount of the sale price including any finance charges attributable thereto; and

> (B) for the purposes of this subsection only, in the case of items purchased on different dates, the first item purchased shall be deemed the first paid for, and in the case of items purchased on the same date, the lowest priced item shall be deemed first paid for.

TENN. CODE ANN. § 47-9-103(e)(2).

Subsection (e)(2) mirrors former TENN. CODE ANN. § 47-9-107(c) (1981) (repealed 2000).[26] Of former § 47-9-107(c) it has been said: "By virtue of adding subsection (c) to T.C.A. § 47-9-407, the Tennessee legislature issued a statutory guideline for courts to use in determining the extent of a creditor's purchase money security interest when the contracts between the parties did not provide such a method." *In re Bray*, 365 B.R. 850, (Bankr. W.D. Tenn. 2007).[27]

---

[26] TENN. CODE ANN. § 47-9-107(c) included within the definition of purchase money security interest:

> (c) under subsections (a) and (b), a purchase money security interest upon any unpaid balance in preexisting collateral arising pursuant to a series of purchases or extension of payment time and terms. Provided, however, that whenever the collateral is consumer goods, the creditor retains no purchase money security interest in any property as to which he has received payments aggregating the amount of the sale price including any finance charges attributable thereto. For the purposes of this section, in the case of items purchased on different dates, the first item purchased shall be deemed the first paid for, and in the case of items purchased on the same date, the lowest priced item shall be deemed first paid for.

TENN. CODE ANN. § 47-9-107(c) (1981) (repealed).

[27] In *Bray,* Judge Boswell concluded that Tennessee favored a dual status rule, but application of the statutory allocation provision to some cases would be impossible. Finding allocation impossible because

27

Prior to the 2001 revisions, this provision had been read to put Tennessee in the "dual status" camp: what relevance would allocation have if a purchase money security interest was transformed when collateral also secures nonpurchase money debt? *In re Nolen*, 53 B.R. 235, 237 (Bankr. M.D. Tenn. 1985). This logic survived the 2001 revisions to the Tennessee UCC. "[W]e presume that where the legislature departs from the language of a model act, it usually does so to express an intention different from the model act." *The Bank/First Citizens Bank v. Citizens & Assocs.*, 82 S.W.3d 259, (Tenn. 2002) (citing *Heirs of Ellis v. Estate of Ellis,* 71 S.W.3d 705, 713-14 (Tenn. 2002); *Kradel v. Piper Indus., Inc.,* 60 S.W.3d 744 (Tenn. 2001)).

The statutory allocation rule provides guidance in these cases to the conclusion that Tennessee is a dual status state. The Hayes Contract provides that CitiFinancial "may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose." The Tucker Contract provides that GMAC "will apply each payment first to the earned and unpaid part of the Finance Charge, and then to the unpaid part of the Amount Financed." Taken together with TENN. CODE ANN. § 47-9-103(e)(2), these provisions allow allocation of payments made by percentage of amounts financed for each item of collateral, and allow determination of the purchase money claims that are eligible for protection from bifurcation under the hanging sentence.

---

of a series of secured and unsecured notes, Judge Boswell concluded in *Bray* that the entire debt was transformed and the hanging sentence did not protect the creditor from bifurcation.

28

## Dual Status or Transformation under the Hanging Sentence

There is some logic to the Trustee's argument that the hanging sentence is all or nothing. The wording of the hanging sentence—"the debt that is the subject of the claim"—could be read as a sort of federal transformation rule. The failure of Congress to include words of limitation such as "to the extent that" or "in whole or in part" contrasts to other sections of the Bankruptcy Code.[28] The legislative history, though densely ambiguous, perhaps lends some support to the Trustee's position.[29]

---

[28] *See, e.g.,* 11 U.S.C. § 521(a)(6) ("personal property as to which a creditor has an allowed claim for the purchase price secured in whole or in part by an interest in such personal property[.]"); 11 U.S.C. § 1326(a)(4) ("personal property . . . securing a claim attributable in whole or in part to the purchase price of such property[.]").

[29] An Addendum to this Memorandum attempts to trace the legislative history of what became the hanging sentence at the end of § 1325(a). That history is convoluted and hardly clear with respect to congressional intent whether a "mixed" security interest forfeits the protection from § 506 that appears in the version of the hanging sentence that ultimately passed as part of BAPCPA.

As originally proposed in the House, the protection from bifurcation was an amendment to 11 U.S.C. § 506 that applied to personal property in general, that extended only to the purchase price—but without mention of the term of art, "purchase money security interest"—and was limited to personal property acquired within 180 days before the petition. Responsible Borrower Protection Bankruptcy Act, H.R. 2500, 105th Cong., § 110 (Sept. 18, 1997). This original seed of the hanging sentence contained "in whole or in part" language that allowed a claim to be partially protected from bifurcation. There was a specific proposed new subdivision of § 506 that would have dealt with mixed security interests like those here in Hayes and Tucker.

The Senate took a broader and different approach. The first mention in the Senate of what became the hanging sentence was probably in S. 1301 as reported in the Senate in June, 1998. Consumer Bankruptcy Reform Act of 1997, S. 1301, 105th Cong., § 302 (June 4, 1998) (as reported in the Senate). S. 1301 amended 11 U.S.C. § 1325 and 11 U.S.C. § 506 to render § 506 inapplicable to any allowed claim provided for by the plan that was secured by a lien on property under nonbankruptcy law and, somewhat redundantly, rendered § 506 inapplicable to an allowed claim attributable "in whole or in part" to the purchase price of personal property acquired within 90 days of a petition. The Senate passed this version of S. 1301 as a substitute for the House bill, H.R. 3150, in September, 1998. *See* Consumer Bankruptcy Reform Act of 1998, H.R. 3150, 105th Cong., § 302 (Sept. 23, 1998) (as passed by Senate with amendment in the nature of a substitute).

The Conference Committee that resulted recommended the House approach with an expanded look-back of five years. In other words, the Conference compromised the more or less unlimited protection from bifurcation in S. 1301 and the 180-day protection in H.R. 2500 and came out with a five-year protection "to the extent attributable in whole or in part to the purchase price of personal property." Conf. Rep. No. 107-794, § 124 (Oct. 7, 1998).

The hanging sentence approach first appears in the 106th Congress in S. 625 introduced in the Senate on March 16, 1999. At that time, the House was proceeding with the Conference Report provision discussed immediately above—which included the "in whole or in part" language in § 506. The Senate abandoned that approach in 1999 with a "flush sentence" at the end of § 1325(a) that contained no "to the extent that" language and, for the first time, differentiated between motor vehicles and any other thing of value.

29

But there are good reasons to reject this reading of the hanging sentence. As detailed above, the collateral-specific conditions in the hanging sentence require the dissection of allowed secured claims in Chapter 13 cases in a manner that doesn't suggest an all or nothing rule. The hanging sentence contemplates that different kinds of collateral even within a single debt transaction would be subject to different rules with respect to the application of § 506 and treatment in a Chapter 13 plan.

The hanging sentence mixes state and federal legal principles in the complicated manner discussed above. Overlaying a federal transformation rule produces a wobbly three-legged stool anchored by no obvious congressional policy choice in this context.[30]

---

S. 625, 106th Cong., § 306 (Mar. 16, 1999).

The House ultimately acquiesced in the Senate's hanging sentence approach. In October 2000, in S. 3186, the Senate added to the flush sentence for the first time a "purchase money security interest" requirement. The Senate version—with a five-year protection for motor vehicles—passed both houses and was pocket vetoed by President Clinton on December 19, 2000.

The hanging sentence that passed both houses in December 2000 did not contain any "to the extent that" language, did include a purchase money security interest requirement and applied a five-year look-back to motor vehicles and a one-year look-back to any other thing of value. Between the end of 2000 and the passage of BAPCPA in 2005, the hanging sentence remained mostly unchanged except for a series of restrictions on time periods that reduced the extent of the protection from bifurcation for motor vehicles from five years to three years and finally to 910 days.

What can be said about this quick travel through the legislative history? The House started with an approach to protection from bifurcation that included "to the extent that" language. This approach was abandoned basically without comment when the House accepted the Senate's hanging sentence approach five years before the passage of BAPCPA. The idea of treating different kinds of collateral differently came from the Senate at about the same time the Senate's hanging sentence approach was substituted for the House's "to the extent that" approach. There is no legislative commentary revealing the purpose of this substitution of concepts. The cross-reference to purchase money security interests was a separate product of the Senate which involved dropping a generic "purchase price" limitation in favor of a complex concept widely used in state law. In general, the Senate started with a broader protection from bifurcation than did the House and after the House accepted the Senate's hanging sentence platform in 2000, the broader protection from bifurcation in the Senate version was limited through a succession of subsequent Congresses. It is difficult to find a helpful line through this maze.

[30] *But see In re Sanders,* No. 07-50783-C, 2007 WL 3047233 (Bankr. W.D. Tex. Oct. 18, 2007) (Because advance to pay negative equity is nonpurchase money debt, entire claim is not protected from § 506 by hanging sentence.).

30

## CONCLUSION

The objections to confirmation are sustained in part and denied in part. The proposed plans are not confirmed. GMAC holds a purchase money security interest within the scope of the hanging sentence to the extent of its claim less amounts charged for GAP and credit disability insurance. CitiFinancial holds a purchase money security interest within the scope of the hanging sentence to the extent of its claim less the amount charged for GAP insurance and less the payoff of negative equity ($4,825.25). Prebankruptcy payments made by the debtors toward the claims of GMAC and CitiFinancial will be allocated pro rata in accordance with TENN. CODE ANN. § 47-9-103(e)(2) and the terms of the contracts.

An appropriate order will be entered.

*This Memorandum was signed and entered electronically as indicated at the top of the first page.*

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

IN RE:        )
            )
BONNIE H. HAYES,    )  CASE NO. 07-02564
            )  CHAPTER 13
  Debtor.      )
            )
STEVEN G. TUCKER,    )  CASE NO. 07-03798
            )  CHAPTER 13
  Debtor.      )

_____

# ADDENDUM

_____

The provision that became the hanging sentence at the end of § 1325(a) has its roots in H.R. 2500, the Responsible Borrower Protection Bankruptcy Act, introduced in the House on September 18 , 1997, by Rep. McCollum. At that time, the concept appeared as an amendment to § 506:

Sec. 110. RESTRAINING ABUSIVE PURCHASES ON SECURED CREDIT.

Section 506 of title 11, United States Code, is amended by adding at the end the following:

'(e) In an individual case under chapter 7, 11, 12, or 13–

'(1) subsection (a) shall not apply to an allowed claim to the extent attributable in whole or in part to the purchase price of personal property acquired by the debtor within 180 days of the filing of the petition, except for the purpose of applying paragraph (3) of this subsection;

'(2) if such allowed claim attributable to the purchase price is secured only by the personal property so acquired, the value of the personal property and the amount of the allowed secured claim shall be the sum of the unpaid principal balance of the purchase price and accrued and unpaid interest and charges at the contract rate;

'(3) if such allowed claim attributable to the purchase price is secured by the personal property so acquired and other property, the value of the security may be determined under subsection (a), but the value of the security and the amount of the allowed secured claim shall be not less than the unpaid

principal balance of the purchase price of the personal property acquired and unpaid interest and charges at the contract rate; and

'(4) in any subsequent case under this title which is filed by or against the individual debtor within two years of the date of filing of the original case, the value of the personal property and the amount of the allowed secured claim shall be deemed to be not less than the amount provided under subparagraphs (2) and (3), as applicable.'.

Responsible Borrower Protection Bankruptcy Act, H.R. 2500, 105th Cong., § 110 (Sept. 18, 1997). A nearly identical provision was included in the Bankruptcy Reform Act of 1998, H.R. 3150, § 128, introduced by Rep. Gekas in the House on February 3, 1998. On June 10, 1998, the House passed H.R. 3150 with only cosmetic changes to § 128.

Just prior to passage of H.R. 3150 in the House, the Senate Reported on S. 1301 on June 4, 1998. As originally introduced on October 21, 1997, S. 1301 contained no provision limiting strip-down of secured claims for personal property in individual bankruptcy cases. As reported, S. 1301 included the following sweeping amendments to §§ 1325 and 506:

SEC. 302. FAIR TREATMENT OF SECURED CREDITORS UNDER CHAPTER 13.

(a) RESTORING THE FOUNDATION FOR SECURED CREDIT- Section 1325(a) of title 11, United States Code, is amended–

(1) in paragraph (5), by striking the matter preceding subparagraph (A) and inserting the following:

`(5) with respect to an allowed claim provided for by the plan that is secured under applicable nonbankruptcy law by reason of a lien on property in which the estate has an interest or is subject to a setoff under section 553--'; and

*(2) by adding at the end of the subsection the following flush sentence:*

`*For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph.'.*

* * *

*(c) DETERMINATION OF SECURED STATUS- Section 506 of title 11, United States Code, is amended by adding at the end the following:*

2

> `(e) Subsection (a) shall not apply to an allowed claim to the extent attributable in whole or in part to the purchase price of personal property acquired by the debtor during the 90-day period preceding the date of filing of the petition.'.*

Consumer Bankruptcy Reform Act of 1997, S. 1301, 105th Cong., § 302 (June 4, 1998) (as Reported in the Senate) (emphasis added).

On September 23, 1998, the Senate passed H.R. 3150 with an amendment in the nature of a substitute, replacing the text of H.R. 3150 with that of S. 1301, as reported. Consumer Bankruptcy Reform Act of 1998, H.R. 3150, 105th Cong., § 302 (Sept. 23, 1998) (as passed by Senate with amendment in the nature of a substitute). The bills as passed by the House and by the Senate were sent to conference.

On October 7, 1998, a Conference Report on H.R. 3150 was issued. H.R. Rep. No. 105-794, (Oct. 7, 1998). The Conference Report followed the original concept offered in H.R. 2500, but expanded the lookback period.

SEC. 124. RESTRAINING ABUSIVE PURCHASES ON SECURED CREDIT.

Section 506 of title 11, United States Code, is amended by adding at the end the following:

(e) In an individual case under chapter 7, 11, 12, or 13–

(1) subsection (a) shall not apply to an allowed claim to the extent attributable in whole or in part to the purchase price of personal property acquired by the debtor within 5 years of the filing of the petition, except for the purpose of applying paragraph (3) of this subsection;

(2) if such allowed claim attributable to the purchase price is secured only by the personal property so acquired, the value of the personal property and the amount of the allowed secured claim shall be the sum of the unpaid principal balance of the purchase price and accrued and unpaid interest and charges at the contract rate;

(3) if such allowed claim attributable to the purchase price is secured by the personal property so acquired and other property, the value of the security may be determined under subsection (a), but the value of the security and the amount of the allowed secured claim shall be not less than the unpaid principal balance of the purchase price of the personal property acquired and unpaid interest and charges at the contract rate; and

(4) in any subsequent case under this title that is filed by or against the debtor in the 2-year period beginning on the date the petition is filed in the

3

original case, the value of the personal property and the amount of the allowed secured claim shall be deemed to be not less than the amount provided under paragraphs (2) and (3).

Conf. Rep. No. 107-794, § 124 (Oct. 7, 1998). Of this provision, the Joint Explanatory Statement of the Committee of Conference stated only:

**CRAMDOWNS**

The House bill prohibited cramdowns for certain secured debts incurred within 180 days prior to bankruptcy. The Senate bill contained an absolute prohibition on cramdowns in Chapter 13 cases. The Committee compromised by prohibiting cramdowns on debts securing personal property incurred within five years of filing for bankruptcy.

Conf. Rep. No. 107-794, Joint Explanatory Statement of the Comm. of Conf. (Oct. 7, 1998). On October 9, 1998, the House passed H.R. 3150 as it was reported out of committee.

On February 24, 1999, now in the 106th Congress, H.R. 833, Bankruptcy Reform Act of 1999, was introduced in the House. The bill mirrored the prior year's Conference Report on H.R. 3150, as accepted and passed by the House, including an identical § 124 as set forth above.

The following month, on March 16, 1999, S. 625 was introduced in the Senate. On strip-down of secured claims, S. 625 took a new approach very similar to what we now call the hanging sentence.

SEC. 306. GIVING SECURED CREDITORS FAIR TREATMENT IN CHAPTER 13.

* * * *

(b) RESTORING THE FOUNDATION FOR SECURED CREDIT- Section 1325(a) of title 11, United States Code, is amended by adding at the end the following flush sentence:

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the debt that is the subject of the claim was incurred within the 5-year period preceding the filing of the petition and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 6-month period preceding that filing.

4

S. 625, 106th Cong., § 306 (Mar. 16, 1999). As Reported out of the Senate, with respect to § 306 it was stated that the provision: "limits certain 'cram down' rights to preserve a fair balance." S. Rep. 106-49, (May 11, 1999).

On April 29, 1999, the House issued H.R. Rep. No. 106-123(I) to accompany H.R. 833. No alterations were made to H.R. 833, § 124, set forth above. Regarding (renumbered) § 122 of the bill, the Report stated:

*Section 122. Restraining abusive purchases on secured credit*

This provision addresses the following problem. Under present law, a debtor, for instance, can finance the purchase of a new automobile with a showroom value of $20,000 by giving the lender a security interest in the vehicle. If the debtor then files for bankruptcy relief one day later, then the value of the secured creditor's lien must be determined under section 506 of the Bankruptcy Code. Even though the vehicle is one day old, the amount of the secured creditor's claim is, under current law, limited to the value of the automobile taking into account the immediate effect of depreciation upon purchase. Accordingly, that secured creditor has an allowed secured claim in a reduced amount based on the value of a used automobile and an allowed unsecured claim for the difference between the present value of the automobile and the amount owed to the secured creditor.

Section 122 of the bill prevents the bifurcation of a secured claim in an individual chapter 7, 11, 12, or 13 case to the extent the claim is attributable in whole or in part to the purchase price of personal property acquired by the debtor within the five-year period preceding the bankruptcy filing. `Personal property' generally includes all property other than real estate. If the claim is secured only by personal property, the amount of the claim is the sum of the unpaid principal balance of the purchase price together with accrued and unpaid interest along with charges at the contract rate. If the claim is secured by other property, the amount of the claim cannot be not less than the unpaid principal balance of the purchase price of the personal property acquired and unpaid interest and charges at the contract rate. This amount, however, must be reduced by any payments actually received.

H.R. Rep. No. 106-123(I) (Apr. 29, 1999) (section-by-section analysis for § 122).

The House passed H.R. 833 on May 5, 1999, including the identical provision that came out of Conference:

SEC. 122. RESTRAINING ABUSIVE PURCHASES ON SECURED CREDIT.

Section 506 of title 11, United States Code, is amended by adding at the end the following:

5

(e) In an individual case under chapter 7, 11, 12, or 13–

(1) subsection (a) shall not apply to an allowed claim to the extent attributable in whole or in part to the purchase price of personal property acquired by the debtor within 5 years of the filing of the petition, except for the purpose of applying paragraph (3) of this subsection;

(2) if such allowed claim attributable to the purchase price is secured only by the personal property so acquired, the value of the personal property and the amount of the allowed secured claim shall be the sum of the unpaid principal balance of the purchase price and accrued and unpaid interest and charges at the contract rate;

(3) if such allowed claim attributable to the purchase price is secured by the personal property so acquired and other property, the value of the security may be determined under subsection (a), but the value of the security and the amount of the allowed secured claim shall be not less than the unpaid principal balance of the purchase price of the personal property acquired and unpaid interest and charges at the contract rate; and

(4) in any subsequent case under this title that is filed by or against the debtor in the 2-year period beginning on the date the petition is filed in the original case, the value of the personal property and the amount of the allowed secured claim shall be deemed to be not less than the amount provided under paragraphs (2) and (3) less any payments actually received.

Bankruptcy Reform Act of 1999, H.R. 833, 106th Cong., § 122 (May 5, 1999) (as passed in the House).

With S. 625 and H.R. 833 already under consideration in both chambers, S. 945 was introduced in the Senate on May 3, 1999. S. 945 picked up language previously abandoned:

SEC. 302. FAIR TREATMENT OF SECURED CREDITORS UNDER CHAPTER 13.

(a) RESTORING THE FOUNDATION FOR SECURED CREDIT- Section 1325(a) of title 11, United States Code, is amended–

(1) in paragraph (5), by striking the matter preceding subparagraph (A) and inserting the following:

* * *

(2) by adding at the end of the subsection the following flush sentence:

6

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph.'

* * *

(c) DETERMINATION OF SECURED STATUS- Section 506 of title 11, United States Code, is amended by adding at the end the following:

(e) Subsection (a) shall not apply to an allowed claim to the extent attributable in whole or in part to the purchase price of personal property acquired by the debtor during the 90-day period preceding the date of filing of the petition.

Consumer Bankruptcy Reform Act of 1999, S. 945, 106th Cong., § 302 (May 3, 1999). S. 945 proceeded no further.

On February 2, 2000, the Senate passed H.R. 833, with an amendment in the form of a substitute that inserted the language of S. 625, as reported.

S. 3046 was introduced in the Senate on September 14, 2000, and on personal property security interest strip-down, the bill included the provision contained in S. 625, as reported, set forth above. Bankruptcy Reform Act of 2000, S. 3046, 106th Cong., § 306 (Sept. 14, 2000).

The phrase qualifying the nature of the security interest protected by the hanging sentence was first added by S. 3186, introduced in the Senate on October 11, 2000:

SEC. 306. GIVING SECURED CREDITORS FAIR TREATMENT IN CHAPTER 13.

* * * *

(b) RESTORING THE FOUNDATION FOR SECURED CREDIT- Section 1325(a) of title 11, United States Code, is amended by adding at the end the following flush sentence:

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the **creditor has a purchase money security interest securing the** debt that is the subject of the claim, the debt was incurred within the 5-year period preceding the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49 ((49 USCA 30102))) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

7

Bankruptcy Reform Act of 2000, S. 3186, 106th Cong., § 306 (Oct. 11, 2000) (emphasis added). S. 3186 also expanded the look back for "any other thing of value" to one year preceding the bankruptcy filing.

Also on October 11, 2000, the House issued H.R. Conf. Rep. No 106-970, to accompany H.R. 2415. The Report took an unrelated bill, H.R. 2415 (a bill to enhance embassy security) and substituted the provisions of S. 3186 as introduced October 11, 2000. The Conference Report was agreed to in the House on October 12, 2000, and passed. On December 17, 2000, the Senate agreed to the conference report, and passed H.R. 2415 (which was the text of S. 3186). The bill was pocket vetoed by President Clinton on December 19, 2000.

S. 220 led off the 107th Congress's effort at bankruptcy reform. Bankruptcy Reform Act of 2001, S. 220, 107th Cong. (Jan. 30, 2001). The relevant provision was identical to that passed by both chambers the previous Congress.

SEC. 306. GIVING SECURED CREDITORS FAIR TREATMENT IN CHAPTER 13.

* * *

(b) RESTORING THE FOUNDATION FOR SECURED CREDIT- Section 1325(a) of title 11, United States Code, is amended by adding at the end the following flush sentence:

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 5-year period preceding the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

S. 220, 107th Cong., § 306 (Jan. 30, 2001). The following day, H.R. 333 was introduced in the House; a bill likewise nearly identical to the previous Congress's Conference Report on H.R. 2415. Bankruptcy Abuse Prevention & Consumer Protection Act of 2001, H.R. 333, 107th Cong. (Jan. 31, 2001). This provision was included in the version of H.R. 333 passed by the House on March 1, 2001.

The Senate passed S. 420, the number under which S. 220 had been reported, on March 15, 2001. For the first time in this bill, the look back periods began to be reduced.

SEC. 306. GIVING SECURED CREDITORS FAIR TREATMENT IN CHAPTER 13.

8

\* \* \*

(b) RESTORING THE FOUNDATION FOR SECURED CREDIT- Section 1325(a) of title 11, United States Code, is amended by adding at the end the following flush sentence:

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 3-year period preceding the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

Bankruptcy Reform Act of 2001, S. 420, 107th Cong., § 306 (Mar. 15, 2001).

On July 17, 2001, H.R. 333 was passed in the Senate in the form of a substitute, its text replaced by S. 420 previously passed in the Senate.

On July 26, 2002, Conference Report 107-617 was released to accompany H.R. 333. Again, there is a reduction in the reach back period of the provision.

SEC. 306. GIVING SECURED CREDITORS FAIR TREATMENT IN CHAPTER 13.

(b) Restoring the Foundation for Secured Credit.-Section 1325(a) of title 11, United States Code, is amended by adding at the end the following:

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

Conf. Rep. No. 107-617, § 306 (July 26, 2002). The Report's section-by-section analysis said of this provision:

Section 306(b) adds a new paragraph to section 1325(a) of the Bankruptcy Code specifying that Bankruptcy Code section 506 does not apply to a debt incurred within the two and one-half year period preceding the filing of the bankruptcy case if the debt is secured by a purchase money security interest

9

in a motor vehicle acquired for the personal use of the debtor. Where the collateral consists of any other type of property having value, section 306(b) provides that section 506 of the Bankruptcy Code does not apply if the debt was incurred during the one-year period preceding the filing of the bankruptcy case. The 910-day period set forth in Section 306(b) of the conference report represents a compromise between the House bill and Senate amendment. Section 306(b) of the House bill provided for a five-year period, while its Senate counterpart specified a three-year period.

Conf. Rep. No. 107-617 (July 26, 2002) (section-by-section analysis for § 306).

The next two plus years saw many bankruptcy bills. Each contained the flush sentence provision as modified by the Conference Report on H.R. 333.

S. 256, the bill that ultimately became BAPCPA, was introduced in the Senate on February 1, 2005. Bankruptcy Abuse Prevention & Consumer Protection Act of 2005, S. 256, 109th Cong. (Feb. 1, 2005). S. 256 included a provision identical to § 306 as amended by the Conference Report of 2002. An identical bill was introduced in the House on February 9, 2005. Bankruptcy Abuse Prevention & Consumer Protection Act of 2005, H.R. 685, 109th Cong. (Feb. 9. 2005). The Report that accompanied S. 256 sheds no more light than its predecessors:

Section 306(b) adds a new paragraph to section 1325(a) of the Bankruptcy Code specifying that Bankruptcy Code section 506 does not apply to a debt incurred within the two and one-half year period preceding the filing of the bankruptcy case if the debt is secured by a purchase money security interest in a motor vehicle acquired for the personal use of the debtor within 910 days preceding the filing of the petition. Where the collateral consists of any other type of property having value, section 306(b) provides that section 506 of the Bankruptcy Code does not apply if the debt was incurred during the one-year period preceding the filing of the bankruptcy case.

H.R. Rep. No. 109-31(I) (Apr. 8, 2005).

Testimony and floor statements that followed bankruptcy reform over the years provide little more of relevance on the provision that became the hanging sentence: some expressing the need to curb abuse by debtors buying new cars on the eve of bankruptcy; other lamenting the irony of a bill that sought to move debtors away from Chapter 7 and into Chapter 13, yet by requiring debtors to pay far more than cars were worth not only stacked the cards against success in Chapter 13 but assured that less would be available to pay unsecured creditors. See 146 Cong. Rec. S11621-04, 2000 WL 1784918 (Daily ed. Dec. 6, 2000) (statement of Sen. Feingold on H.R. 2415 ("Here is another sort of Orwellian title. Section 306 is called 'Giving Secured Creditors Fair Treatment Under Chapter 13.' It ought to be called 'Giving Certain Secured Creditors Preferred Treatment Under Chapter 13' because it favors those who make car loans over other secured creditors and

over unsecured creditors. . . . This gives special treatment to the lender and, more importantly, it will make it much more difficult for a chapter 13 plan to work, and that will hurt people who want to pay off their debts in an organized fashion under chapter 13. . . . The anticramdown provision undermines the efficacy of chapter 13. All the experts tell us that. I have to point out the irony here. The avowed purpose of proponents of this bill is to move people from chapter 7 discharges to chapter 13 repayment plans. Yet the bill actually has the effect of undermining chapter 13."); S. Rep. No. 106-49 (May 11, 1999) (to accompany S. 625 as reported in the Senate at May 11, 1999) (views of Sen. Kohl) ("[T]his provision turns the idea of a "secured" interest on its head. In the everyday world, . . . , your "secured" interest is the value of that car. . . . [This provision] defies common sense. Why should a "secured" creditor have more powerful rights inside of bankruptcy than outside? And why should car loans get better treatment than loans to purchase washing machines, farm equipment or boats? Even worse, increasing the amount of "secured" debts will only make it harder for debtors to successfully complete chapter 13 plans, which already fail at an abysmal 67 percent rate.").